# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:21-cv-00270-MR-WCM

RUPA VICKERS RUSSE,          )
                             )
          Plaintiff,         )
                             )        <u>MEMORANDUM OF</u>
     vs.                     )        <u>DECISION AND ORDER</u>
                             )
CINDIE HARMAN,               )
                             )
          Defendant.         )
_____)

**THIS MATTER** is before the Court on the Defendant's Motion for Judgment on the Pleadings [Doc. 42], the Plaintiff's Motion in Limine to Take Judicial Notice [Doc. 57], the Defendant's Motion for Summary Judgment [Doc. 65], the Defendant's Motion to Exclude Phaedra Xanthos from Testifying as Plaintiff's Expert [Doc. 67], the Plaintiff's Motion for Summary Judgment [Doc. 72], and the Plaintiff's Motion to Seal Plaintiff's Medical Records [Doc. 73].

## I.    PROCEDURAL BACKGROUND

Before the Court is a defamation case brought by a candidate for public office against an internet commentator.  On October 5, 2021, the Plaintiff Rupa Vickers Russe ("Plaintiff") filed this action against Cindie Harman

("Defendant"). [Doc. 3]. In her Complaint, the Plaintiff asserts claims against the Defendant for libel per se, libel per quod, unfair and deceptive trade practices, and intentional infliction of emotional distress. [Id. at ¶¶ 30-55].

On October 5, 2022, the Defendant moved for judgment on the pleadings with respect to all of the Plaintiff's claims. [Doc. 42]. On December 1, 2022, the Plaintiff filed a Motion in Limine to Take Judicial Notice ("Motion to Take Judicial Notice") [Doc. 57]. In her Motion to Take Judicial Notice, the Plaintiff requests that this Court take judicial notice of the following:

1. There is no public record that Ms. Russe has ever filed for bankruptcy . . .

2. There is no public record that Ms. Russe has ever been convicted of a non-traffic citation crime . . .

3. There is no public record that Ms. Russe has ever had a claim of taking someone's Trademark brought against her . . . .

[Id. at 1].

On January 6, 2023, the Defendant moved for summary judgment with respect to all of the Plaintiff's claims. [Doc. 65]. The Defendant also moved to exclude the testimony of the Plaintiff's expert witness, Phaedra Xanthos. [Doc. 67].

On January 20, 2023, the Plaintiff moved for summary judgment with respect to her claims for libel per se, unfair and deceptive trade practices,

and intentional infliction of emotional distress.  [Doc. 72; Doc. 72-1 at 29].

The Plaintiff also moved to file her medical records under seal.  [Doc. 73].

## II.    STANDARD OF REVIEW

### A.    Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  A Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve any disputes of fact.  Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014).  A motion for judgment on the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  See id.; Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002).  A court thus accepts all well-pled facts as true and construes the facts in the light most favorable to the plaintiff as the nonmoving party.  Burbach Broadcasting Co. of Delaware, 278 F.3d at 405-06; Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).  However, a court does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement."  Nemet Chevrolet, Ltd. V. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).  Nor does a court accept as true "unwarranted inferences, unreasonable conclusions, or

arguments." <u>Wahi v. Charleston Area Med. Ctr., Inc.</u>, 562 F.3d 599, 615 n. 26 (4th Cir. 2009). The key difference between Rule 12(b)(6) and Rule 12(c) is that in ruling on a Rule 12(c) motion the court may consider the answer as well as the complaint. <u>See</u> <u>Hartford Cas. Ins. Co. v. Gelshenen</u>, 387 F. Supp. 3d 634, 637 (W.D.N.C. 2019), *aff'd* 801 F. App'x 915 (4th Cir. 2020).

### B. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>, 106 S. Ct. at 2510.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (internal citations omitted).

4

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3, 106 S. Ct. at 2552 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" on the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S. Ct. 2510; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255, 106 S. Ct. at 2513. Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider "each motion separately on its own merits 'to determine

whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## III. FACTUAL BACKGROUND

The following facts are not in dispute, unless otherwise noted. The Defendant is a resident of Madison County, North Carolina. [Harman Dep., Doc. 72-31 at 6]. The Plaintiff is currently a resident of Virginia. [Russe Dep., Doc. 65-3 at 9]. In 2020, the Plaintiff resided in Madison County, North Carolina. [See id. at 17, 31-32, 49, 53-56, 58-59].

In January of 2020, the Plaintiff began collecting signatures in an attempt to get her name on the November 2020 ballot as an unaffiliated candidate for the North Carolina House of Representatives. [Id. at 53-55]. The Plaintiff was unsuccessful in that effort. [Id. at 54-55]. Thereafter, the Plaintiff emailed the Madison County Democratic Chair to inquire about running for an open seat on the Madison County Board of Commissioners. [Id. at 58]. In July of 2020, the Plaintiff secured the Madison County Democratic Party's nomination for the open county commissioner's seat. [Id. at 58-59].

6

The Defendant created and operated the website savemadisoncounty.org.[1]  [Harman Dep., Doc. 72-31 at 9].  The website is owned by Save Madison County NC LLC, and the Defendant is its only member, manager, or member manager.  [Id. at 49; see also Doc. 72-23].  Neither Save Madison County NC LLC nor savemadisoncounty.org has any employees.  [Harman Dep., Doc. 72-31 at 49].  The LLC does not maintain any bank accounts in its name, and it does not receive funds from any individual, political group, or company.  [Id.].  Save Madison County NC LLC is not a party to this action.

On savemadisoncounty.org, the Defendant wrote about "a little bit of everything," including politics in Madison County.  [Id. at 9].  In 2020, the Defendant also used an additional service to send email newsletters notifying readers when new articles were posted to savemadisoncounty.org.  [Id. at 50-51].  During the Plaintiff's campaign for the Madison County Board of Commissioners, the Defendant published articles about the Plaintiff on savemadisoncounty.org.  [Id. at 19].  The Defendant "[did] not feel that Ms. Russe was fit to be a candidate or to sit as a County Commissioner," and she "[did] not [write] anything positive" about the Plaintiff.  [Id.]

---

[1] The website savemadisoncounty.org was deplatformed in January of 2021.  [Harman Dep., Doc. 72-31 at 16].

7

In July of 2020, before the Plaintiff received the Democratic nomination for the open county commissioner's seat, the Defendant emailed the Plaintiff a link to an article the Defendant wrote about the Plaintiff. [Russe Dep., Doc. 65-3 at 61-63]. This email was the Plaintiff's "first notice that [the Defendant] had posted something about [her]." [Id.]. In October and November of 2020, the Plaintiff discovered that the Defendant had published additional articles about her. [Id. at 62].

During the Plaintiff's campaign, the Defendant published the following allegedly defamatory statements about the Plaintiff in articles on savemadisoncounty.org:

> "Rupa has a rap sheet of over 24 pages long, which includes Foreclosure, bankruptcy[,] larceny, and abuse of her daughter." [See Doc. 65-2 at 34, 52, 82, 90, 132, 216, 239].

> The Plaintiff "[t]ook someone else's trademark – assaulted her child – Tax delinquent Buncombe – Larceny Buncombe and the beat goes on . . ." [See id. at 47, 83].

> "Ru[p]a Russe – the idiot with the rap sheet of larceny – assault – delinquency of taxes etc . . ." [See id. at 210].

> "Maybe the skillsets you mean are the facts that you like to bully individuals on [F]acebook and assault your own children?" [See id. at 55, 229, 232].

"She has a rap record of over 24 pages long, which includes larceny – more assault and delinquent taxes." [See id. at 40, 92, 95].

"[L]ook what she did to her daughter," published alongside a warrant for the Plaintiff's arrest. [See id. at 43].

"Child popper – Rupa Russe." [See id. at 14, 17-19, 45-46, 53, 61-62, 79-80, 89, 93, 131, 214, 226, 230-231].

"Rupa – her Bankrupt[c]y and her Foreclosure." [See id. at 29, 33, 43, 131].

"An attorney is also supposed to have 'moral fitness' that makes him worthy of his client's trust . . . Rupa is 'Not' an attorney and is 'NOT LICENSED' in NC to practice law PERIOD. Rupa is desperate and lying again – Who wants to vote for a liar?" [See id. at 22].

"My beautiful 'Don't Get Ruped Signs.'" [See id. at 91].

"Don't Get Duped by Rupe. Let me know if you need one of my signs." [See id. at 23, 48, 52, 58, 82, 142, 216].

"A Rupa Russe – Dave's 209 darling." [See Russe Dep., Doc. 65-3 at 187].

"The Rupa's of this world are our enemies." [See Doc. 65-2 at 81].

"Rupa Russe will destroy this County, the last thing we need is her involved with money." [See id. at 49, 212].

"[G]rifter." [See id. at 34, 132, 142, 153, 184, 240, 251].

9

"[L]iar." [See id. at 22, 55, 58, 229, 232].

"[F]raud." [See id. at 34-36, 132-134, 142, 240, 251].

"This woman is a con and a train wreck and wants to freeload off this County." [See id. at 24].

"Turkey vultures feasting on your naivety. Thinking you won't figure it out." [See Russe Dep., Doc. 65-3 at 197].

"Fake and hiding who they indeed are." [See id.].

"She is lying and selling snake oil to anyone who will buy it." [See Doc. 65-2 at 218].

"I will tell you one thing if you Democrats tomorrow vote to put this trainwreck on the [t]rail to be on the November ballot. I will go to every County listed below and research the background for all these litigations." [See id. at 57].

"Boo Hoo poor Pimple Child Popper – Rupa Russe complaining she is being bullied – Honey, if you can't take the heat, get out of the kitchen. Because it is going to get hotter . . ." [See id. at 28, 45, 135, 214].

The Defendant also published statements about the Plaintiff's earlier petition to get on the ballot for an open seat in the North Carolina House of Representatives.[2] [See id. at 196, 219]. Further, the Defendant published

---

[2] In her Complaint, the Plaintiff alleges that the "Defendant has made false statements on her website accusing Plaintiff of engaging in voter fraud and that Defendant has reported Plaintiff for that fraud to the North Carolina State Board of Elections." [Doc. 3 at ¶ 27]. However, Plaintiff did not identify any specific statements related to voter fraud in her Complaint. Based on the evidence presented by the parties, the Court was able to identify the following statements published by the Defendant: "I found many anomalies, not just

an audio segment about the Plaintiff entitled "Rupa's Beans."  [See id. at 32,

130; Harman Dep., Doc. 72-31 at 77].[3]

The following is a recitation of the relevant facts related to the above

statements.   The facts surrounding the Defendant's posting of these

statements is largely uncontroverted and provides the context within which

the Plaintiff's claims must be analyzed.

### A.    Statements related to assault

The Defendant published statements on savemadisoncounty.org

indicating that the Plaintiff assaulted her daughter or was charged with

---

the fact that over 30% percent of the signees were eliminated and not counted . . . Rupa and her conscious homesteaders stated that signees were signing a survey to allow the unaffiliated to be on the ballot, not for Rupa but all unaffiliated candidates.  That smells and should be addressed by the State Board of Elections," [Doc. 65-2 at 196]; and "PETITION RUPA RUSSE – SEE IF YOUR NAME IS LISTED[.]  [L]et me know if you didn't sign your name or were lied to about what you were signing – We have our own list that will be going to the State Board of Elections," [id. at 219].  The Defendant testified that she "was getting phone calls from people telling [her] that they did not sign" the Plaintiff's petition, and she "referred every one of them over to the Board of Elections in the state and over to the Board of Elections in Madison County."  [Harman Dep., Doc. 72-31 at 26].

[3]The Court notes that, in the Plaintiff's deposition testimony, the Plaintiff identifies additional allegedly defamatory statements published by the Defendant, including the following, among many others: "this cheating is typical of these parasites that call themselves homesteaders," stated in reference to the Plaintiff's taxes, [Russe Dep., Doc. 65-3 at 125]; "oh so honest Rupa," [id. at 133]; and "[i]f your mother had not been paying to keep you up, she might have had the extra cash to get an MRI," [id. at 142-43].  The Plaintiff simply does not identify any of these additional statements in her Complaint.  Any additional statements that the Plaintiff identified in her deposition testimony but failed to allege in her Complaint are not part of this lawsuit.  Accordingly, the Court does not address those statements.  Rather, the Court's analysis focuses only on the allegedly defamatory statements that are included in the Plaintiff's Complaint.

assaulting her daughter. On July 29, 2020, the Defendant sent an article with the headline "Pimple Popper Rupa Russe Turns out to be a Child Popper instead" to her email subscribers. [Doc. 72-5 at 3]. The Defendant's additional statements related to assault include the following: "Rupa has a rap sheet of over 24 pages long, which includes [f]oreclosure, bankruptcy[,] larceny, and *abuse of her daughter*," [see Doc. 65-2 at 34, 52, 82, 90, 132, 216, 239] (emphasis added); the Plaintiff "assaulted her child," [see id. at 47, 83]; "Ru[p]a Russe – the idiot with the rap sheet of larceny – *assault* . . . ." [see id. at 210] (emphasis added); "Maybe the skillsets you mean are the facts that you like to bully individuals on [F]acebook and *assault your own children*," [see id. at 55, 229, 232] (emphasis added); "She has a rap record of over 24 pages long, which includes larceny – *more assault* and delinquent taxes," [see id. at 40, 92, 95] (emphasis added); "look at what she did to her daughter," [see id. at 43]; and "Child popper – Rupa Russe," [see id. at 14, 17-19, 45-46, 53, 61-62, 79-80, 89, 93, 131, 214, 226, 230-231]. In some articles, these statements were published alongside a picture of a warrant for the Plaintiff's arrest. [See id. at 14, 17, 43, 53-54, 60, 98-99, 224, 228].

On October 19, 2019, the Plaintiff was arrested and charged with assaulting her teenage daughter following an incident where the Plaintiff

attempted to take a cell phone from her daughter.[4] [Doc. 65-9; see also Russe Dep., Doc. 65-3 at 63; Doc. 65-11 at 8]. The Plaintiff admits that "there was physical contact between [the Plaintiff's] daughter and [the Plaintiff]" during this incident. [Russe Dep., Doc. 65-3 at 68]. The Plaintiff was not convicted as a result of this incident. [Id. at 65, 85, 110, 128-29, 180]. Rather, the State voluntarily dismissed the charge against the Plaintiff prior to July of 2020. [Id. at 66, 85, 128, 131-32, 160, 162]. Because she was not convicted, the Plaintiff argues that there is no evidence that the accusations in the October 19, 2019 warrant are true.[5] [Id. at 183].

The Defendant submitted a public records request to the Madison County Clerk of Court, and she obtained the October 19, 2019 warrant in response to that request. [Harman Dep., Doc. 72-31 at 69-70]. The Defendant testified that "the warrant showed that [the Plaintiff] was arrested," and "[t]he warrant, itself, had everything in it." [Id. at 63]. When the

---

[4] The Plaintiff's arrest following this incident is also the subject of a separate lawsuit, brought by the Plaintiff, which is presently before the Court. There, the Plaintiff alleges that a deputy at the Madison County Sheriff's Department violated her Fourth and Fourteenth Amendment rights when he ordered her to be handcuffed, strip-searched, and placed in solitary confinement upon her arrest. See Russe v. Madison Cnty. Sheriff's Dep't et. al, Civil Case No. 1:22-CV-00221-MR-WCM.

[5] The Plaintiff also testified that when the Defendant made these statements, she "had no access to any information to prove whether or not [the Plaintiff] had, in fact, assaulted [her] daughter . . . [,]" and the Defendant had access to records that "showed the case had been dismissed way prior to July 2020." [Russe Dep., Doc. 65-3 at 161-62].

13

Defendant referred to the Plaintiff as a "child popper," she intended to reference "the fact that there was an arrest warrant in place where [the Plaintiff] assaulted her daughter." [Id. at 48-49]. The Defendant "never said [the Plaintiff] was convicted" of assault, and she was not aware that the charge against the Plaintiff was voluntarily dismissed. [Id. at 69, 113].

The Defendant "only saw the one arrest . . . [from] Madison County." [Id. at 74]. However, the Defendant testified that she used the phrase "more assault" in reference to the Plaintiff "[b]ecause there were other indications on the public record" about such incidents, but she "could not get to the other documents that were in other places." [Id.].

### B. Statements related to larceny

The Defendant also published the following statements connecting the Plaintiff to larceny on savemadisoncounty.org: "Rupa has a rap sheet of over 24 pages long, which includes [f]oreclosure, bankruptcy[,] *larceny*, and abuse of her daughter," [see Doc. 65-2 at 34, 52, 82, 90, 132, 216, 239; Harman Dep., Doc. 72-31 at 141-42] (emphasis added); the Plaintiff "[t]ook someone else's trademark – assaulted her child – [t]ax delinquent Buncombe – *Larceny Buncombe* and the beat goes on . . . ." [see Doc. 65-2 at 47, 83] (emphasis added); "Ru[p]a Russe – the idiot with the rap sheet of *larceny* – assault . . . ." [see id. at 210; Harman Dep., Doc. 72-31 at 141-42]

14

(emphasis added); and "[s]he has a rap record of over 24 pages long, which includes *larceny* . . . ." [see Doc. 65-2 at 40, 92, 95] (emphasis added).[6]

In or around 2007, the Plaintiff co-owned a hostel with Barry Decker, the father of her two children. [Russe Dep., Doc. 65-3 at 72]. After the Plaintiff separated from Mr. Decker and moved to a new house, she "went over to the hostel . . . and [she] took one mattress . . . so that [her] four-year-old" would have her own bed. [Id. at 72-73]. The Plaintiff also "took a microwave because [the Plaintiff] didn't have one and there were two at . . . the hostel." [Id.]. After the Plaintiff removed the mattress and the microwave from the hostel, Mr. Decker took out a warrant against her for larceny. [Id.]. The case was later dismissed. [Id.]. The Plaintiff admits that "[t]here's a larceny claim with [her] name attached to it" related to this incident with Mr. Decker. [Id. at 71]. The Plaintiff denies that she committed larceny.[7] [Id. at 73, 177-78].

The Defendant learned of the larceny charge from information in public records that she obtained from Madison County. [Harman Dep., Doc. 72-31

---

[6] The parties, in their arguments to the Court, have broken down the Defendant's statements into categories based on subject matter. In order to address such arguments, it becomes necessary for the rendition of the underlying facts to be somewhat repetitive in order to present each allegedly defamatory statement within the context it was made.

[7] The Plaintiff testified that if the Defendant had the "rap sheet," the Defendant could see that she was not convicted of larceny, [Russe Dep., Doc. 65-3 at 73], and that "there is no evidence anywhere that [she] committed larceny . . ." [id. at 177-78].

at 62]. The Defendant testified that she "never said the [Plaintiff] was convicted [of larceny], and a rap sheet does not mean [the Plaintiff was] convicted." [Id. at 63].

## C. Statements related to bankruptcy

The Defendant published statements on savemadisoncounty.org indicating that the Plaintiff's record included a bankruptcy action. [Harman Dep., Doc. 72-31 at 33]. Those statements include the following: "Rupa has a rap sheet of over 24 pages long, which includes [f]oreclosure, *bankruptcy* . . . ." [See Doc. 65-2 at 34, 52, 82, 90, 132, 216, 239] (emphasis added); and "Rupa – her *[b]ankrupt[c]y* and her [f]oreclosure," [see id. at 29, 33, 43, 131] (emphasis added).

The Plaintiff has never filed for bankruptcy. [Russe Dep., Doc. 65-3 at 79]. Instead, the Plaintiff was involved in a bankruptcy proceeding as a creditor when Mr. Decker filed for bankruptcy.[8] [Id.].

---

[8] The Plaintiff presented portions of her own deposition testimony that would not be admissible at trial regarding such things as Mr. Decker's motivations regarding the bankruptcy filing and the foreclosure proceeding for a property co-owned by Mr. Decker and the Plaintiff. A summary judgment motion, however, must be decided on the forecast of *admissible* evidence. See Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015) ("The court may consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where the 'party submitting the evidence show[s] that it will be possible to put the information . . . into admissible form.'"). The Plaintiff has not explained how she would present evidence of Mr. Decker's motivations in an admissible form at trial.

The Defendant found information connecting the Plaintiff to a bankruptcy proceeding on two different websites. [Harman Dep., Doc. 72-31 at 156]. On one website, kidslivesafe.com, the Defendant found this information along with a file number, the name of an attorney, and the address of the federal courthouse in Asheville, North Carolina. [Id. at 33-34].

The Defendant did not research the bankruptcy action in PACER,[9] where the Plaintiff is listed as a creditor in a bankruptcy action involving Mr. Decker. [Doc. 72-22 at 1; see also Harman Dep., Doc. 72-31 at 38-39]. The Defendant testified that she "guess[es] [she] could have" accessed PACER. [Id. at 40-41]. Instead, the Defendant "went by what [she] believed to be accurate by two sources that had documentation, . . . [a] filing number, [and] an address to the federal court." [Id. at 42]. Therefore, the Defendant did not research the bankruptcy action on PACER. [Id. at 44]. Prior to this lawsuit, the Defendant had not seen the official court record of the bankruptcy action. [Id. at 61].

### D. Statements related to foreclosure and tax delinquency

The Defendant published statements on savemadisoncounty.org indicating that the Plaintiff owned a property that was subject to foreclosure

---

[9] PACER (Public Access to Court Electronic Records) provides the public with electronic access to federal court records.

proceedings and that the Plaintiff failed to pay property taxes. Those statements include the following: "Rupa has a rap sheet of over 24 pages long, which includes *[f]oreclosure* . . . ." [see Doc. 65-2 at 34, 52, 82, 90, 132, 216, 239] (emphasis added); "[she] [t]ook someone else's trademark – assaulted her child – [*t]ax delinquent Buncombe* . . . ." [see id. at 47, 83] (emphasis added); "Ru[p]a Russe – the idiot with the rap sheet of larceny – assault – *delinquency of taxes* etc. . . . ." [see id. at 210] (emphasis added); "[s]he has a rap record of over 24 pages long, which includes larceny – more assault and *delinquent taxes*," [see id. at 40, 92, 95] (emphasis added); and "Rupa – her [b]ankrupt[c]y and her *[f]oreclosure*," [see id. at 29, 33, 43, 131] (emphasis added).

The Plaintiff admits that she had an ownership interest in a property that was subject to foreclosure proceedings. [Russe Dep., Doc. 65-3 at 74-75]. The Plaintiff co-owned two properties in Asheville, North Carolina with Mr. Decker. [Id.]. When the Plaintiff separated from Mr. Decker, they agreed that the Plaintiff would maintain and pay the property taxes of one property while Mr. Decker would maintain and pay the property taxes of the second property. [Id.]. However, both properties remained in both names. [Id.]. Mr. Decker allowed the second property to go into tax foreclosure, but the Plaintiff thereafter paid the taxes to prevent a foreclosure sale. [Id. at 75-77].

The Defendant learned that the Plaintiff owned property that was subject to foreclosure proceedings and that the Plaintiff failed to pay property taxes in Buncombe County from information in public records. [Harman Dep., Doc. 72-31 at 62, 70].

### E. Statements related to trademark theft

The Defendant published a statement on savemadisoncounty.org that the Plaintiff "[t]ook someone else's trademark." [Doc. 65-2 at 47, 83; Harman Dep., Doc. 72-31 at 141, 144]. The Defendant testified that she found a document online that showed the Plaintiff "was a defendant" in a trademark case. [Harman Dep., Doc. 72-31 at 144, 146-47]. The Defendant posted the first page of that document on savemadisoncounty.org. [Id.; Russe Dep., Doc. 65-3 at 82].

The Plaintiff asserts that she has "never stolen anybody's trademark" or been accused of stealing a trademark. [Russe Dep., Doc. 65-3 at 79-80]. The Plaintiff applied for the trademark "WEunity" to be used in connection with a mobile application, and WeWork Incorporated filed an opposition to the Plaintiff's application with the United States Patent and Trademark Office ("USPTO"). [Id. at 79-81; see also Doc. 65-11 at 7; Doc. 72-4 at 4; Doc. 72-30 at 9]. The opposition lists the Plaintiff as a defendant. [Doc. 72-4 at 4; 72-30 at 9]. Notwithstanding the objection, the USPTO issued the Plaintiff a

trademark for "WEunity." [Doc. 65-11 at 7]. The Plaintiff testified that if the Defendant was able to publish the first page of WeWork's opposition online, then "she actually downloaded the entire document, and it makes it very clear that [WeWork] is just saying they think there's a likelihood of confusion." [Russe Dep., Doc. 65-3 at 82].

### F. Statements that the Plaintiff was not licensed to practice law in North Carolina

On October 30, 2020, the Defendant published the following statement on savemadisoncounty.org regarding the Plaintiff's license to practice law in North Carolina: "An attorney is also supposed to have 'moral fitness' that makes him worthy of his client's trust . . . Rupa is 'Not' an attorney and is 'NOT LICENSED' in NC to practice law PERIOD. Rupa is desperate and lying again – Who wants to vote for a liar?" [Doc. 65-2 at 21-22].

In July of 2019, the Plaintiff sat for the Uniform Bar Exam ("UBE") in Washington, D.C. [Russe Dep., Doc. 65-3 at 19-20]. In October of 2019, the Plaintiff received an email informing her that she passed the UBE. [See id. at 20-21; Doc. 65-2 at 112-113]. In May of 2020, the Plaintiff applied to transfer her UBE score to North Carolina. [Russe Dep., Doc. 65-3 at 24]. In September of 2020, the Plaintiff posted a copy of the October 2019 email stating that she passed the UBE on Facebook. [Doc. 65-2 at 111-113]. In September of 2020, the Defendant wrote an article responding to that

Facebook post, and the Defendant stated, in part, that "Rupa Russe is not licensed in the state of NC to practice law . . ." [Id.]. On September 13, 2020, the Defendant sent this article to her email subscribers. [Id.].

On October 26, 2020, the Plaintiff received a letter from the North Carolina Board of Law Examiners informing her that she "was approved for admission to the North Carolina bar . . . ." [Harman Dep., Doc. 72-31 at 125-29; Russe Dep., Doc. 65-3 at 28]. On October 30, 2020, the Plaintiff posted a copy of the letter on Facebook stating, in part, that she would be offering legal services in Madison County. [Doc. 65-2 at 26-27; Harman Dep., Doc. 72-31 at 127-28]. On that same day, the Defendant republished the Plaintiff's Facebook post on savemadisoncounty.org, alongside the following statements:

> First folks, this above is examiners office and not the NC Bar . . . NC Bar could care less about Rupa because she is "NOT LICENSED." She has only transferred her JD to NC which does not give her the ability to practice law. This is more fraud by her – Redact it, tell the truth Rupa . . .
>
> A JD proves you have a legal education, but it does not give you a law license. Without the license, you are not an attorney, and you are not entitled to practice law. The bar exam is only part of getting a license. *An attorney is also supposed to have 'moral fitness' that makes him worthy of his client's trust.* Past or current problems such as academic misconduct, abuse of the legal process, drug and alcohol issues and breaking the law could all count

21

against someone trying to earn the right to "Esquire or Attorney."

Here is the link: [link to "NC Bar Attorney Lookup"]

[P]ull her name in, you will see, as I and others have been saying all along – *Rupa is 'Not" an attorney and is "NOT LICENSED" in NC to practice law PERIOD.*

*Rupa is desperate and lying again – Who wants to vote for a liar?*

[Doc. 65-2 at 20-25, 27] (emphasis added).[10]  The Defendant searched the online "attorney look-up" functions of the state bar websites of all fifty states and the District of Columbia, and she learned that the Plaintiff "was not licensed [to practice law] on October 26, 2020."  [Harman Dep., Doc. 72-31 at 132-35].

The Plaintiff testified that, even after receiving the October 26, 2020 letter from the North Carolina Board of Law Examiners, "obviously, you can't start practicing until you go in and take the oath."  [Russe Dep., Doc. 65-3 at 28].  The Plaintiff further testified that "[y]ou're admitted, you're approved, but you can't hold yourself out as an attorney.  You can't start taking cases until you've actually gone through all of the administrative steps, including taking

---

[10] The Court is able to deduce that the Defendant published this statement on October 30, 2020 because the Plaintiff submitted screenshots of this article that the Plaintiff took on October 30, 2020.  [See Doc. 65-2 at 20-25].  Because the Plaintiff posted a copy of the October 26, 2020 letter on Facebook on October 30, 2020, [id. at 26-27; Harman Dep., Doc. 72-31 at 127-28], the Defendant could not have published this statement on savemadisoncounty.org any earlier than October 30, 2020.

that oath."  [Id.].  The Plaintiff was officially admitted to the North Carolina

State Bar on November 6, 2020.  [See id., at 29; see also Doc. 72-16 at 11].

The Plaintiff was admitted to the District of Columbia Bar in December of

2020.  [Russe Dep., Doc. 65-3 at 21-22].

### G.    Statements expressing opinions about the Plaintiff

The Defendant published the following opinions about the Plaintiff on

savemadisoncounty.org:

> "Maybe the skillsets you mean are the facts that you
> like to *bully individuals on [F]acebook* and assault
> your own children?"[11]  [Doc. 65-2 at 55, 229, 232]
> (emphasis added).

> "A Rupa Russe – Dave's 209 Darling."[12]   [Russe
> Dep., Doc. 65-3 at 187].

> "The Rupa's of this world are our enemies."  [Doc.
> 65-2 at 81].

> "Rupa Russe will destroy this County, the last thing
> we need is her involved with money."  [Id. at 49, 212;
> Harman Dep., Doc. 72-31 at 143].

---

[11] The Defendant testified that she "had stuff that [the Plaintiff] was threatening people"
who posted articles from savemadisoncounty.org on Facebook and that the Plaintiff "told
them that they could be sued."  [Harman Dep., Doc. 72-31 at 70-71].  It is unclear what
"stuff" the Defendant had or exactly what the Plaintiff stated on Facebook.

[12] The Plaintiff testified that the Defendant "has ridiculed Dave's 209 before" and that this
statement "associate[d] [the Plaintiff] with someone that [the Defendant's] readers . . .
would know [the Defendant] disparages or disagrees [with] in some way."  [Russe Dep.,
Doc. 65-3 at 187].  The parties have presented no evidence as to who or what "Dave's
209" is or how he or it is related to the Plaintiff.  The Court will take judicial notice that
Dave's 209 is a restaurant in Madison County.

The Plaintiff is a "grifter," a "liar," and a "fraud." [See Doc. 65-2 at 22, 34-36, 55, 58, 132-134, 142, 153, 184, 229, 232, 240, 251; Harman Dep., Doc. 72-31 at 75, 81-82, 144].

The Plaintiff "is a con and a train wreck and wants to freeload off this County. [Doc. 65-2 at 24; Harman Dep., Doc. 72-31 at 143].

The Plaintiff and another candidate are "[t]urkey vultures feasting on your naivety. Thinking you won't figure it out." [Russe Dep., Doc. 65-3 at 197].

The Plaintiff is "[f]ake and hiding who they indeed are." [Id.].

The Plaintiff "[i]s lying and selling snake oil to anyone who will buy it." [Doc. 65-2 at 218; Harman Dep., Doc. 72-31 at 145].

In opposition to the Plaintiff's candidacy, the Defendant also printed and distributed yard signs with the slogan "Don't Get Duped By Rupe." [Harman Dep., Doc. 72-31 at 23-24, 49]. The Defendant referenced these signs on savemadisoncounty.org by publishing the following statements: "Don't Get Duped by Rupe. Let me know if you need one of my signs," [see Doc. 65-2 at 23, 48, 52, 58, 82, 142, 216]; and "My beautiful 'Don't Get Ruped Signs,'" [see id. at 91; see also Harman Dep., Doc. 72-31 at 23].

The Plaintiff denies that she bullied individuals on Facebook, that she is a grifter, that she is a liar or that she is the type of person who "would dupe

somebody."[13]  [Russe Dep., Doc. 65-3 at 110, 116, 132, 139, 180].  The Plaintiff further agues that the statements that "the last thing we need is [the Plaintiff] involved with money," that the Plaintiff "is a con and a train wreck and wants to freeload off this County," that the Plaintiff is a "[t]urkey vulture feasting on your naivety," that the Plaintiff is "[f]ake and hiding who [she is]," and that the Plaintiff "is lying and selling snake oil," impugn her in professional role as an attorney.[14]  [Id. at 191-92, 197, 201-02].

## H. "Rupa's Beans" audio segment

The Defendant published an audio segment about the Plaintiff entitled "Rupa's Beans," which the Defendant described as "a funny video that you use during campaigns."  [Harman Dep., Doc. 72-31 at 77-78].

---

[13] The Plaintiff testified that "there's no evidence that [she] bullied anybody on Facebook . . . or that [she is] a bully in any way," [Russe Dep., Doc. 65-3 at 180], that "[t]here's no evidence to prove that [she] would be a grifter," [id. at 110], that she has "never been convicted of, [or] . . . charged with . . . theft or swindling or anything that would qualify [her] as a grifter," [id. at 132], that "[t]here's no evidence that [she is] a liar," [id. at 139], and that "[t]here's nothing in the record that would indicate [she] would dupe somebody," [id. at 116].  At the summary judgment stage, the Plaintiff may not rely on mere allegations or general denials.  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  Further, the Defendant argues that she is entitled to summary judgment because the Plaintiff cannot prove that the Defendant acted with actual malice.  [Doc. 65-1 at 3].  The Defendant is not moving for summary judgment based on the defense of truth, except where the Plaintiff has admitted that the Defendant's statements are true.

[14] The Plaintiff also argues that the statement that she is a "train wreck" mischaracterizes her to the public.  [Russe Dep., Doc. 65-3 at 202].  The Plaintiff does not explain how this statement is a mischaracterization.  Further, at the summary judgment stage, the Court need not accept the Plaintiff's "unwarranted inferences, unreasonable conclusions, *or arguments*."  Eastern Shore Mkt. Inc., 213 F.3d at 180 (emphasis added).

25

**I.     Statement that "if you Democrats tomorrow vote to put this trainwreck on the [t]rail to be on the November ballot[,] I will go to every County listed below and research the background for all these litigations."**

The Defendant published a statement on savemadisoncounty.org that "if you Democrats tomorrow vote to put this trainwreck [the Plaintiff] on the [t]rail to be on the November ballot[,] [the Defendant] will go to every County listed below and research the background for all these litigations."  [Doc. 65-2 at 57; Harman Dep., Doc. 72-31 at 54, 145].  The Defendant testified that, in making this statement, she meant that she would go to each of the counties listed on the Plaintiff's "rap sheet" and "look up further everything that was in those documents."  [Harman Dep., Doc. 72-31 at 54].

**J.     Statement that "Boo Hoo Pimple Child Popper – Rupa Russe complaining she is being bullied – Honey, if you can't take the heat, get out of the kitchen.  Because it is going to get hotter[.]"**

The Defendant published the following statement on savemadisoncounty.org: "Boo Hoo Pimple Child Popper – Rupa Russe complaining she is being bullied – Honey, if you can't take the heat, get out of the kitchen.  Because it is going to get hotter . . . ."  [Doc. 65-2 at 28, 45, 135, 214; Harman Dep., Doc. 72-31 at 83].  The Defendant testified that, when one runs for public office, "[y]ou're signing up to be in the public – the public has every right to see and state how they feel . . . [W]hen you have

26

someone that's running for public office[,] you're going to get people saying both sides, good, bad, ugly, all of it."  [Harman Dep., Doc. 72-31 at 85-86].

### K.    Effects of statements on the Plaintiff

After the Defendant published statements that the Plaintiff was a "child popper" and had assaulted her daughter, the Plaintiff experienced "a lot of anxiety about whether or not [her] daughter and her private information . . . was going to become fodder."  [Russe Dep., Doc. 65-3 at 84-85].   The Plaintiff began to experience heart palpitations, and a health care provider at the Madison County Health Department prescribed a medication to "help calm the heart issue."  [Id. at 86; Doc. 69-1 at 2].  The Plaintiff also attended weekly psychotherapy sessions, where, on one occasion, she reported trouble sleeping.  [Doc. 69-1 at 4].  The Plaintiff's anxiety stemmed from "seeing the posts [the Defendant] made that disclosed private information about [her] daughter[,] [that] did not fully retract [sic] [the Plaintiff's] Social Security number from . . . the warrant[,] and [that] disclosed a minor's full name . . . ."  [Russe Dep., Doc. 65-3 at 88].

The Plaintiff also needed to take the prescribed medication after reading statements the Defendant published related to bankruptcy, trademark theft, and the Plaintiff's license to practice law.  [Id.].   The Plaintiff

testified that she had not been diagnosed with anxiety or heart issues prior to this period. [Id. at 95]. The Plaintiff stated that:

> [W]hat was so shocking is I didn't know that I could have that type of reaction. And when [the health care provider] suggested medication[,] I was very concerned. I was raised a hippie. We don't do a lot of medicine . . . So it was a big deal for me to be willing to take it, but I knew I had to because I didn't want to put my health at risk due to [the Defendant's] posts.

[Id.].[15] The Plaintiff stopped taking the medication for her heart palpitations after the November 2020 election. [Id. at 87].

The Plaintiff further testified that she felt "unsafe" at a polling station where a group of men installed "Don't Get Duped by Rupe" signs, returned to their truck, and "continued to rip-roar it up." [Id. at 211]. The Plaintiff also installed a security gate at her home. [Id. at 214].

---

[15] During her trial testimony in a separate case currently before this Court, the Plaintiff also testified that she experienced anxiety, heart palpitations, and trouble sleeping at least two years prior to 2020. In that case, the Plaintiff and the estate of her mother, Katherine Monica Vickers, allege that health care providers at the Charles George VA Medical Center were negligent in their treatment of Ms. Vickers, who died in 2018. See Russe, et., al v. United States of America, Civil Case No. 1:20-CV-00092-MR-WCM. A bench trial was held in that case in March of 2023. Id., Docs. 196, 197, 198, 199. In that bench trial, the Plaintiff testified that, while serving as Ms. Vickers' primary caregiver, the Plaintiff "started to have, for the first time in [her] life, heart palpitations" and that she "was not able to sleep because of the anxiety." Id., Doc. 196 at 90. The Plaintiff further testified that she was prescribed a medication used to treat anxiety and depression. Id., Doc. 196 at 92. Accordingly, the Court notes that, by the Plaintiff's own admission, the anxiety, heart palpitations, and trouble sleeping that the Plaintiff describes as being triggered by the Defendant's allegedly defamatory statements in 2020 are not the first occurrences of those symptoms, nor is 2020 the first occasion on which the Plaintiff took medication for those symptoms.

The Plaintiff presented affidavits from individuals who were residents of Madison County between January of 2020 and December 31, 2020. [McCullough Affidavit., Doc. 72-25; Jackson Affidavit, Doc. 72-25; Azarmi Affidavit, Doc. 72-25; Tenner Affidavit, Doc. 72-25; Munoz Affidavit, Doc., 72-25]. Kristen Munoz, a resident of Madison County, stated that:

> Between October and November 2020 I knew that Ms. Russe was emotionally distressed because of the statements that Cindie Harman was posting about her in 2020. Ms. Russe told me she was suffering from insomnia, had an overwhelming fear for her safety, and was suffering from heart palpitations because of Cindie Harman's posts, that required her to take medication.

[Munoz Affidavit, Doc. 72-25 at ¶ 7].[16]

Further, the Plaintiff opened her law firm, Vickers Russe Law PLLC in January of 2021. [Russe Dep., Doc. 65-3 at 30-33]. Erica Tenner, another resident of Madison County, "chose not to contact Ms. Russe to inquire about hiring her [to perform legal services] because" Ms. Tenner believed the Defendant's statements about the Plaintiff's involvement in bankruptcy and trademark theft. [Tenner Affidavit, Doc. 72-25 at ¶¶ 6-7].

---

[16] The Plaintiff provides no indication as to how she believes her self-serving statements to a third party would be admissible.

## IV. DISCUSSION

### A. Defendant's Motion for Summary Judgment

The Defendant moves for summary judgment with respect to all of the Plaintiff's claims. [Doc. 65].

### 1. Defamation Claims

This is a case of a candidate for political office, who voluntarily made herself a public figure, bringing an action against a citizen who disparaged the Plaintiff's character in opposition to her candidacy. Political discourse in the United States rests on "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," as well as political candidates. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 721, 11 L.Ed.2d 686 (1964). The mere idea that a citizen could be liable for publishing negative statements about a candidate for public office flies in the face of that commitment. Nonetheless, the Court will address the Plaintiff's arguments as to why her claims should survive summary judgment.

The Plaintiff asserts claims against the Defendant for libel per se and libel per quod.[17]  [Doc. 3 at ¶¶ 30-43].

Under North Carolina law:

> Libel per se is a publication which, when considered alone without explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace.

---

[17] At the outset of the Court's analysis, the Court notes that the Plaintiff failed to allege in her Complaint specifically when the allegedly defamatory statements were published. [See Doc. 3].  Rather, the Plaintiff merely alleges that she learned of some of the Defendant's statements in October and November of 2020.  [See id. at ¶ 9].  In a defamation action, "[t]he complaint must set forth who said what to whom, *as well as when* and where *the defamatory statements were made*."  Bowman v. Reid, Civil Case No. 5:14-CV-00179-RLV, 2015 WL 4508648, at *7 (W.D.N.C. July 24, 2015) (citing Diagnostic Devices, Inc. v. Pharma Supply, Inc., Civil Case No. 3:08-CV-00149-RJC-DSC, 2009 WL 3633888, at *13 (W.D.N.C. Oct. 20, 2009)) (emphasis added); see also Church Ekklasia Sozo Inc. v. CVS Health Corp., Civil Case No. 3:20-CV-00382-RJC-DSC, 2022 WL 1572732, at *11 (W.D.N.C. Feb. 25, 2022).  Further, the Court notes that the Plaintiff has largely failed to remedy this deficiency at the summary judgment stage. The Plaintiff has presented evidence that she first learned that the Defendant had published an article about her in July of 2020 and that she discovered additional articles the Defendant had published about her in October and November of 2020.  [Russe Dep., Doc. 65-3 at 61-63].  The Plaintiff also presented evidence that, on July 29, 2020, the Defendant sent an article with the headline "Pimple Popper Rupa Russe Turns out to be a Child Popper instead" to her email subscribers, [Doc. 72-5 at 3], and that, on October 30, 2020, the Defendant published the statement that "Rupa is 'Not' an attorney and is 'NOT LICENSED' in NC to practice law PERIOD.  Rupa is desperate and lying again – Who wants to vote for a liar?" [Doc. 65-2 at 20-25, 27].  The Plaintiff has failed, however, to present evidence of when the Defendant published the other allegedly defamatory statements that are unrelated to calling the Plaintiff a "child popper" or to the Plaintiff's law license.  On this basis alone, most of the Plaintiff's defamation claims are subject to dismissal.  Nonetheless, because the parties have presented a forecast of evidence, the Court will proceed to examine that evidence to determine whether either party is entitled to judgment as a matter of law.

Skinner v. Reynolds, 237 N.C. App. 150, 152, 764 S.E.2d 652, 655 (2014) (internal citations and quotation marks omitted).  For a defamatory statement to be libelous per se, it "must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that [it] tend[s] to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided."  Id. at 153, 764 S.E.2d at 655 (quoting Nucor Corp. v. Prudential Equity Grp., LLC, 189 N.C. App. 731, 736, 659 S.E.2d 483, 486 (2008)).  In contrast, a statement is libelous per quod "when a publication is not obviously defamatory, but when considered in conjunction with innuendo, colloquium, and explanatory circumstances it becomes libelous."  Id. at 157, 764 S.E.2d at 657 (quoting Nguyen v. Taylor, 200 N.C. App. 387, 392, 684 S.E.2d 470, 474 (2009)).

"[T]o recover for defamation, a plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation."  Boyce & Isley, PLLC v. Cooper, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011).  Truthful statements cannot give rise to a libel action.  Id. at 478, 710 S.E.2d at 317.  Further, speech is constitutionally protected where it "cannot 'reasonably [be] interpreted as stating actual facts' about an individual."  Milkovich v. Lorain J. Co., 497 U.S. 1, 20, 110 S. Ct. 2695, 2707,

111 L.Ed.2d 1 (1990) (quoting Hustler Mag., Inc., v. Falwell, 485 U.S. 46, 50, 108 S. Ct. 876, 879, 99 L.Ed.2d 41 (1988)); see also Daniels v. Metro Mag. Holding Co., LLC, 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006) ("Although someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability, a pure expression of opinion is protected because it fails to assert actual fact."). Whether a publication is an actionable statement of fact is a matter of law to be decided by the court. See Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 184-86 (4th Cir. 1998) (analyzing, as a matter of law, whether allegedly defamatory statements were "readily verifiably as true or false").

The Supreme Court has instructed that public figures alleging defamation must prove that the defamatory statements were published with actual malice. Monitor Patriot Co., v. Roy, 401 U.S. 265, 270, 91 S. Ct. 621, 624-25, 28 L.Ed.2d 35 (1971) (citing New York Times Co., 376 U.S. at 279-80, 84 S. Ct. at 726).[18] Candidates for public office are public figures, and

_____

[18] Recently, Justice Thomas has opined that the Supreme Court should reconsider the actual malice standard because New York Times and the Supreme Court's later decisions extending it have "no relation to the text, history, or structure of the Constitution." Coral Ridge Ministries Media, Inc., v. S. Poverty L. Ctr., 142 S. Ct. 2453, 2454-55 (Mem), 213 L.Ed.2d 1102 (2022) (quoting Tah v. Global Witness Publ'g, Inc., 991 F.3d 231, 251 (D.C. Cir. 2021) (Silberman, J., dissenting in part)) (Thomas, J., dissenting from denial of certiorari); see also McKee v. Cosby, 139 S. Ct. 675 (Mem), 203 L.Ed.2d 247 (2019) (Thomas, J., concurring from denial of certiorari); Berisha v. Lawson, 141 S. Ct. 2424 (Mem), 210 L.Ed.2d 991 (2021) (Thomas, J., dissenting from denial of certiorari). Rather, "[t]he States are perfectly capable of striking an acceptable balance between encouraging

the actual malice standard extends to statements related to "anything which might touch on a [candidate's] fitness for office . . . ." Id. at 271-73, 91 S. Ct. at 625-26. Indeed, if the "First Amendment was fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes . . . then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." Id. at 271-72, 91 S. Ct. at 265 (internal citation and quotation marks omitted). Accordingly, candidates for public office must clear a high bar to make a defamation claim. Here, the Plaintiff has undoubtably made herself a public figure by seeking public office.[19]

_____

robust public discourse and providing a meaningful remedy for reputational harm." McKee, 139 S. Ct. at 682 (Thomas, J., concurring from denial of certiorari).

[19] At various points in this litigation, the Plaintiff has asserted different arguments as to whether she is a public figure. In her response to the Defendant's Motion for Judgment on the Pleadings, the Plaintiff asserted that the Defendant "continued to publish defamatory statements about Plaintiff well into 2021, at which time she [was] simply a private figure, having lost the [November 2020] election." [Doc. 46]. Later, in her Memorandum in support of her own Motion for Summary Judgment, the Plaintiff asserts that she was a "limited public figure during her campaign," and she argues that "[a]s a candidate for office, who did not yet possess public official immunity, Plaintiff should not be held to the same standard for actual malice that an elected public official must meet." [Doc. 72-1 at 23 n.14]. In support of this argument, the Plaintiff cites to Barr v. Matteo, 360 U.S. 564, 79 S. Ct. 1335, 3 L.Ed.2d 1434 (1959), a Supreme Court case in which employees brought a defamation action against the director of a government agency. There, the Court found that the director was immune from liability for the allegedly defamatory statements made in a press release issued "within the outer perimeter of [his] line of duty . . . ." Barr, 360 U.S. at 575, 79 S. Ct. at 1342. Notably, Barr is entirely irrelevant to this case, where a candidate for public office has brought a defamation action against a private citizen.

Therefore, the issue in this case is whether the Plaintiff has presented evidence from which a reasonable juror could conclude that the Defendant published the allegedly defamatory statements with actual malice.

To prove that a statement was published with actual malice, a public figure must prove that the publisher acted with knowledge that the statement was false or with reckless disregard for its truth.  New York Times Co., 376 U.S. at 280, 84 S. Ct. at 726.  "A 'reckless disregard' for the truth . . . requires more than a departure from reasonably prudent conduct."  Harte-Hanks Commc'ns, Inc., v. Connaughton, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696, 105 L.Ed.2d 562 (1989).  While failure to investigate, alone, is insufficient to establish that a defendant acted with reckless disregard for the truth, "the purposeful avoidance of the truth is in a different category."  Id. at 692, 109

The Plaintiff now appears to have abandoned her prior positions.  In her response to the Defendant's Motion for Summary Judgment, the Plaintiff now concedes that she is a public figure.  [Doc. 76 at 2, 5].  Further, the Fourth Circuit has instructed that "there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify the New York Times rule."  Time v. Johnson, 448 F.2d 378, 381 (4th Cir. 1971) (quoting Rosenblatt v. Baer, 383 U.S. 75, 87, n. 14, 86 S. Ct. 669, 677, 15 L.Ed.2d 597 (1966)).  However, "mere passage of time will not necessarily insulate from the application of New York Times Co. v. Sullivan, publications relating to the past public conduct of a then 'public figure.'"  Id.  Here, the Plaintiff has failed to produce specific evidence as to when many of the allegedly defamatory statements were published, and, even if the Defendant did publish such statements in 2021, those publications would be, at most, only one year following the Plaintiff's campaign. Therefore, the Court concludes that the Plaintiff did not shed her role as a public figure, and she is a public figure for the purposes of this lawsuit.

S. Ct. at 2698; <u>see</u> <u>also</u> <u>Desmond v. News and Observer Publ'g Co.</u>, 375 N.C. 21, 42, 846 S.E.2d 647, 661 (2020). To establish reckless disregard for the truth, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication" or that he acted with a "high degree of awareness of . . . probable falsity." <u>Harte-Hanks Commc'ns, Inc.</u>, 491 U.S. at 688, 109 S. Ct. at 2696 (quoting <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); <u>Garrison v. Louisiana</u>, 379 U.S. 64, 74, 85 S. Ct. 209, 215, 13 L.Ed.2d 125 (1964)). Evidence of evil intent or ill will is not evidence of actual malice. <u>Id.</u> at 666, 109 S. Ct. at 2685; <u>Desmond</u>, 375 N.C. at 42, 846 S.E.2d at 661.

### a. Statements related to assault

As for the Defendant's statements that the Plaintiff assaulted her daughter, that the Plaintiff is a "child popper," and that the Plaintiff's "rap sheet" includes "assault," "more assault," and "abuse of her daughter," the Plaintiff has failed to present evidence from which a reasonable juror could conclude that the Defendant published those statements with actual malice. The Plaintiff has presented no evidence that the Defendant knew those statements were false or that the Defendant "entertained serious doubts as to the truth" of those statements. <u>See</u> <u>Harte-Hanks Commc'ns, Inc.</u>, 491

36

U.S. at 688, 109 S. Ct. at 2696. It is uncontroverted that the Plaintiff was charged with assaulting her daughter and arrested therefor. [See Doc. 65-9; see also Russe Dep., Doc. 65-3 at 63]. As such, there was probable cause for law enforcement authorities to believe the assault had occurred. The Defendant relied on the arrest warrant when publishing the statements related to assault, and she was unaware that the charge was voluntarily dismissed. [See Harman Dep., Doc. 72-31 at 45, 63, 69-70]. Similarly, regarding the statement that the Plaintiff's "rap sheet" also includes "more assault," the Plaintiff presented evidence only that the Defendant believed that statement to be true because she found "other indications" of assault in the public record. [Id. at 74]. Thus, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to the Defendant's statements related to assault.

### b. Statements related to larceny

The forecast of evidence shows that the Defendant stated that the Plaintiff's "rap sheet" includes larceny. [Doc. 65-2 at 34, 40, 47, 52, 82-83, 90, 92, 95, 132, 210, 216, 239; Harman Dep., Doc. 72-31 at 141-42]. It is uncontroverted, however, that Mr. Decker took out a warrant against the Plaintiff for larceny. [Russe Dep., Doc. 65-3 at 71-73]. The Plaintiff has presented no evidence that the Defendant made these statements with

knowledge of falsity or reckless disregard for the truth. Rather, the Plaintiff presented evidence only that the Defendant relied on public records that she received from Madison County when publishing these statements. [Harman Dep., Doc. 72-31 at 62]. Accordingly, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to the Defendant's statements that the Plaintiff's "rap sheet" includes larceny.

### c. Statements related to bankruptcy

Regarding the Defendant's statements that the Plaintiff's record includes a bankruptcy action, the Plaintiff argues that the Defendant acted with actual malice when publishing these statements because the Defendant failed to investigate the bankruptcy action on PACER, and the Defendant failed to heed the disclaimer on kidslivesafe.com stating that information on the website is susceptible to errors. [Doc. 72-1 at 18-21, 25].[20] This evidence, however, falls below the actual malice standard. An individual acts with "reckless disregard for the truth" when he "in fact entertained serious doubts as to the truth of his publication" or when he acted with a "high degree of awareness of . . . probable falsity." Harte-Hanks Commc'ns, Inc., 491 U.S.

---

[20] The website kidslivesafe.com includes a disclaimer stating that the information on the website "is provided for informational purposes only and is susceptible to errors." [Id. at 36; see also Doc. 72-19 at 1]. The Defendant testified that she did not know that kidslivesafe.com included this disclaimer on its website. [Harman Dep., Doc. 72-31 at 34].

at 688, 109 S. Ct. at 2696.  A mere failure to investigate is insufficient to show that an individual acted with reckless disregard for the truth.  Id. at 692, 109 S. Ct. at 2698.

Here, the Plaintiff has presented no evidence that the Defendant "in fact entertained serious doubts" as to whether the Plaintiff's record included a bankruptcy action or that the Defendant acted with a "high degree of awareness" that the Plaintiff was a creditor, rather than a debtor, in a bankruptcy action.  Instead, the forecast of evidence indicates that the Defendant was unaware of the disclaimer on kidslivesafe.com, the Defendant thought that her statements were true because she found information connecting the Plaintiff to a bankruptcy action on two separate websites, and the Defendant did not search for the bankruptcy proceeding in PACER.  [Harman Dep., Doc. 72-31 at 33-36, 38-44, 156].  Simply failing to further investigate the bankruptcy action, without more, is insufficient to establish reckless disregard for the truth.[21]  Accordingly, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as

---

[21] Having addressed this issue, the Court need not address whether asserting that the Plaintiff's record includes bankruptcy is defamatory, either per se or per quod.  Bankruptcy is a statutory remedy to allow individuals and businesses a "fresh start."  The Plaintiff does not indicate how employing such a remedy subjects one to hatred, contempt or ridicule.

they relate to the Defendant's statements that the Plaintiff's record includes a bankruptcy action.

### d. Statements related to foreclosure and tax delinquency

As for the Defendant's statements that the Plaintiff's record includes tax delinquency and foreclosure, the Plaintiff admitted that she co-owned a property for which property taxes were delinquent, and the Plaintiff further admitted that the property was subject to foreclosure proceedings before she paid the taxes to prevent the foreclosure sale. [Russe Dep., Doc. 65-3 at 74-77]. Accordingly, the Plaintiff has failed to present evidence from which a reasonable juror could find that the statements connecting the Plaintiff to a foreclosure proceeding and to tax delinquency are false.

Further, even if those statements were false, the Plaintiff has offered no evidence from which a reasonable juror could find that the Defendant either knew the statements related to foreclosure and tax delinquency were false or "entertained serious doubts as to the truth" of those statements. See Harte-Hanks Commc'ns, Inc., 491 U.S. at 688, 109 S. Ct. at 2696. Therefore, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to the Defendant's statements about foreclosure and tax delinquency.

40

### e. Statements related to trademark theft

As for the Defendant's statement that the Plaintiff "[t]ook someone else's trademark," [Doc. 65-2 at 47, 83; Harman Dep., Doc. 72-31 at 141, 144], the Plaintiff appears to argue that the Defendant acted with actual malice because the Defendant's possession of WeWork's opposition to the Plaintiff's own trademark application implies that the Defendant knew the contents of that document.[22]  [See Doc. 76 at 9].  However, the Plaintiff failed to present evidence from which a reasonable juror could conclude that the Defendant knew that her statement about the opposition filed by WeWork was false or that she entertained serious doubts as to its veracity.  At most, the Plaintiff has presented evidence that the Defendant possessed a document that more fully explained WeWork's filing because the Defendant posted the first page of that document on savemadisoncounty.org.  [Russe Dep., Doc. 65-3 at 79-82; Harman Dep., Doc. 72-31 at 144, 146-47].  The

---

[22] In support of her argument, the Plaintiff cites Desmond v. News and Observer Publ'g Co., 241 N.C. App. 10, 772 S.E.2d 128 (2015), and she asserts that "pursuant to Desmond, Plaintiff can prove actual malice based on Defendant's false attribution of a false statement to an official record, and 'purposeful avoidance of the truth' as stated in the official record in her possession at the time the statement was made." [Doc. 76 at 9]. The Plaintiff's reliance on Desmond is misplaced.  In Desmond, the North Carolina Court of Appeals held, in part, that there was a genuine issue of material fact where a reporter attributed comments to three sources, all of whom denied making the comments or stated that the comments were taken out of context.  Desmond, 241 N.C. App. at 21-22, 772 S.E.2d at 137.   Desmond does not address whether a defendant who possesses document can be assumed to know the contents of that document.

uncontroverted evidence is that the Defendant merely believed that the document showed the Plaintiff "was [a] defendant" in a trademark action, [Harman Dep., Doc. 72-31 at 144], and the opposition filed by WeWork lists the Plaintiff as a defendant, [Doc. 72-4 at 4; 72-30 at 9]. After all, WeWork objected to the Plaintiff's trademark application on the basis that it would infringe on its trademarks. It was only by a subsequent determination by the Patent and Trademark Office that this was rejected. Accordingly, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to the Defendant's statement that the Plaintiff "[t]ook someone else's trademark."

### f. Statement that the Plaintiff was not licensed to practice law in North Carolina

The Plaintiff presented evidence that, on October 30, 2020, the Defendant published the statement that "[a]n attorney is also supposed to have 'moral fitness' that makes him worthy of his client's trust . . . Rupa is 'Not' an attorney and is 'NOT LICENSED' in NC to practice law PERIOD. Rupa is desperate and lying again – Who wants to vote for a liar?" [Doc. 65-2 at 20-25, 27]. The Plaintiff also presented evidence that on September 13, 2020, the Defendant wrote and sent an article to her email subscribers stating, in part, that "Rupa Russe is not licensed in the state of NC to practice law . . ." [Doc. 65-2 at 111-113]. It is uncontroverted, however, that the

42

Plaintiff was not admitted to the North Carolina State Bar until November 6, 2020. [Russe Dep., Doc. 65-3 at 28-29; Doc. 72-16 at 11]. The Plaintiff has presented no evidence showing that the Defendant published the statements about the Plaintiff's law license with knowledge of falsity or reckless disregard for the truth. At the time the statement was made it was true. The Plaintiff only presented evidence that, in October of 2020, the Defendant did not find the Plaintiff's name listed when searched in the online "attorney look-up" function of the North Carolina State Bar website, and the Defendant relied on that research when publishing her October 30, 2020 statement that the Plaintiff was not licensed to practice law. [See Harman Dep., Doc. 72-31 at 132-35]. Accordingly, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to the Defendant's statement that the Plaintiff was not licensed to practice law in North Carolina.

### g.    Statements that are unactionable

The following statements are not actionable because they do not assert verifiable facts:

> "Maybe the skillsets you mean are the facts that you like to *bully individuals on [F]acebook* . . ."[23] [Doc. 65-2 at 55, 229, 232] (emphasis added).

---

[23] Whether the Plaintiff's Facebook postings constitute "bullying" is a matter of opinion rather than a verifiable fact, and, as such, the Defendant's statement cannot form a basis

43

"Don't Get Duped by Rupe." [Harman Dep., Doc. 72-31 at 70-71; Doc. 65-2 at 23, 48, 52, 58, 82, 91, 142, 216].

"A Rupa Russe – Dave's 209 darling." [Russe Dep., Doc. 65-3 at 187].

"The Rupa[s] of this world are our enemies." [Doc. 65-2 at 81].

"Rupa Russe will destroy this County, the last thing we need is her involved with money." [Id. at 65-2 at 49, 212; Harman Dep., Doc. 72-31 at 143].

"[G]ifter," "[L]iar," "[F]raud."[24] [Doc. 65-2 at 22, 34-36, 55, 58, 132-134, 142, 153, 184, 229, 232, 240, 251; Harman Dep., Doc. 72-31 at 75, 81-82, 144].

"This woman is a con and a train wreck and wants to freeload off this County." [Doc. 65-2 at 24; Harman Dep., Doc. 72-31 at 143].

The Plaintiff and another candidate are "[t]urkey vultures feasting on your naivety. Thinking you won't figure it out." [Russe Dep., Doc. 65-3 at 197].

---

for a defamation claim. Further, even if this statement asserts a verifiable fact, the Plaintiff has presented no evidence that the Defendant made this statement with actual malice.

[24] The parties presented evidence that the Defendant called the Plaintiff a "grifter" and a "fraud" generally, rather than in connection with specific circumstances or events. [See Doc. 65-2 at 34-36, 132-134, 142, 153, 184, 240, 215; Harman Dep., Doc. 72-31 at 75, 81-82]. Further, the Plaintiff presented evidence that the Defendant called her a "liar" both generally and in connection with the Plaintiff's assertion that she was licensed to practice law in North Carolina. [See Doc. 65-2 at 22, 55, 58, 229, 232; Russe Dep., Doc. 65-3 at 139, 157, 194, 197, 213; Harman Dep., Doc. 72-31 at 75, 80-82, 144]. To the extent that the Plaintiff argues that the Defendant defamed her by stating that she lied about her license to practice law, that claim is addressed in the Court's analysis of the Defendant's statement that the Plaintiff was not licensed to practice law in North Carolina.

44

The Plaintiff is "[f]ake and hiding who they indeed are." [Id.].

The Plaintiff "is lying and selling snake oil to anyone who will buy it." [Doc. 65-2 at 218; Harman Dep., Doc. 72-31 at 145].

"[I]f you Democrats tomorrow vote to put this trainwreck on the [t]rail to be on the November ballot[,] I will go to every County listed below and research the background for all these litigations." [Doc. 65-2 at 57; Harman Dep., Doc. 72-31 at 54, 145].

"Boo Hoo Pimple Child Popper – Rupa Russe complaining she is being bullied – Honey, if you can't take the heat, get out of the kitchen. Because it is going to get hotter[.]"[25] [Doc. 65-2 at 28, 45, 135, 214; Harman Dep., Doc. 72-31 at 83].

Speech is constitutionally protected if it "cannot 'reasonably [be] interpreted as stating actual facts' about an individual." Milkovich, 497 U.S. at 20, 110 S. Ct. at 2707 (quoting Falwell, 485 U.S. at 50, 108 S. Ct. at 879). In these statements, the Defendant does not assert facts about the Plaintiff that can be proven as true or false. Rather, the Defendant expresses her negative opinions about the Plaintiff's character and fitness for the political office that the Plaintiff sought, and the Defendant foreshadowed that she would continue to publish statements about the Plaintiff. Accordingly, the

---

[25] To the extent that the Defendant refers to the Plaintiff as a "Child Popper," that portion of this statement is addressed in the Court's analysis of the Defendant's statements related to assault.

Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to these statements.

### h. Statements that the Plaintiff engaged in voter fraud.

The Plaintiff failed to allege in her Complaint any specific statement the Defendant published accusing her of committing voter fraud. In an action for defamation, "[t]he words attributed to [the] defendant [must] be alleged 'substantially' *in haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory." <u>Mbadiwe v. Union Mem'l Reg'l Med. Ctr.</u>, Civil Case No. 3:05-CV-00049-MU, 2005 WL 3186949, at *4 (W.D.N.C. Nov. 28, 2005) (quoting <u>Stutts v. Duke Power Co.</u>, 47 N.C. App. 76, 83, 266 S.E.2d 861, 866 (1980)). In her Complaint, the Plaintiff has only presented the general allegation that the "Defendant has made false statements on her website accusing Plaintiff of engaging in voter fraud and that Defendant has reported Plaintiff for that fraud to the North Carolina State Board of Elections." [Doc. 3 at ¶ 27]. The Plaintiff has failed to properly allege that the Defendant published statements accusing the Plaintiff of engaging in voter fraud, and, on this basis alone, the Plaintiff's defamation claims regarding any such statements are subject to dismissal.

To the extent that the Defendant may have published statements accusing the Plaintiff of committing voter fraud, the Plaintiff also failed to

present any evidence from which a reasonable juror could find that the Defendant acted with actual malice in publishing those statements. Accordingly, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to the Defendant's statements that the Plaintiff engaged in voter fraud.

### i.     "Rupa's Beans" audio segment

The Plaintiff failed to allege in her Complaint or present any evidence of any statement published in the "Rupa's Beans" audio segment. Thus, the Court will grant summary judgment to the Defendant on the Plaintiff's defamation claims as they relate to the "Rupa's Beans" audio segment.

### j.     Conclusion as to Defamation Claims

For all these reasons, the Court will grant summary judgment to the Defendant as to all of the Plaintiff's defamation claims, and the Plaintiff's defamation claims are hereby dismissed.

### 2.     Unfair and Deceptive Trade Practices Claim

To recover for unfair and deceptive trade practices, a plaintiff must prove the following three elements: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant." Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 35, 568 S.E.2d 893, 901 (2002). "[A] libel *per se* of a type impeaching a party in its

business activities is an unfair or deceptive act in or affecting commerce in violation of N.C.G.S. § 75-1.1, which will justify an award of damages . . . for injuries proximately caused."  Id. at 35-35, 568 S.E.2d at 902 (quoting Ellis v. Northern Star Co., 326 N.C. 219, 266, 388 S.E.2d 127, 131 (1990)).  The North Carolina Court of Appeals has instructed that there are "no compelling grounds . . . to distinguish defamatory remarks concerning one's trade or profession made during the course of a political campaign from those made in some other forum."  Id. at 37, 568 S.E.2d at 902 ("If defamatory remarks concerning one's trade or profession affect commerce, as has been held, we fail to see how the context of a political campaign, with its wide-spread broadcast of such statements by multiple media, can lessen rather than heighten the impact upon commerce.").

Under § 75-1.1(b), however, the term "commerce" does not include "professional services rendered by a member of a learned profession."  N.C. Gen. Stat. § 75-1.1(b).  Therefore, "professional services rendered by an attorney in the course of his business are exempt from the statute and may not form the basis of an unfair or deceptive trade practices claim."  Boyce & Isley, 153 N.C. App. at 36, 568 S.E.2d at 902.

Although the parties in this case had no commercial relationship, the Plaintiff argues that the "Defendant's statements defamed Plaintiff in her

48

legal profession as they attacked her fiduciary and ethical duties, and [the Defendant] affected commerce by marketing [sic] the published false statements on her website and in signage placed by Defendant on roads throughout Madison County, North Carolina." [Doc. 72-1 at 27]. The practice of law is not "in commerce" as that term is defined in § 75-1.1(b). As such, if the Defendant's statements affect the Plaintiff's practice of law, such statements would be actionable, if at all, as defamation and not pursuant to Chapter 75. The Plaintiff's unfair and deceptive trade practices claim is premised entirely on her argument that the Defendant defamed her. Having determined that the Plaintiff's defamation claims fail, her unfair and deceptive trade practices claim must likewise fail. Therefore, the Defendant is entitled to summary judgment on this claim as well.

### 3. Intentional Infliction of Emotional Distress Claim

To recover for intentional infliction of emotional distress, a plaintiff must prove "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause[,] (3) severe emotional distress to another." Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Whether conduct "may reasonably be found to be sufficiently outrageous as to permit recovery" is a matter of law to be determined by the court. Hogan v. Forsyth

Country Club Co., 79 N.C. App. 483, 490, 340 S.E.2d 116, 121 (1986). The

North Carolina Court of Appeals has instructed that:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community . . . .

> The liability clearly *does not extend to mere insults, indignities*, [or] threats . . . The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam . . . .

Id. at 493-94, 340 S.E.2d at 123 (quoting Restatement (Second) of Torts, §

46 comment (d) (1965)) (emphasis added).

Establishing conduct as "extreme and outrageous" presents a high bar

for any litigant. But that bar is even higher for a public figure. A public figure

seeking recover for the publication of statements allegedly resulting in

emotional distress must prove, by clear and convincing evidence, that the

statement was false and it was published with actual malice. Falwell, 485

U.S. at 56, 108 S. Ct. at 882 (holding that "public figures and public officials

50

may not recover for the tort of intentional infliction of emotional distress by reason of publications [of parody] without showing . . . that the publication contains a false statement of fact which was made with 'actual malice'"); Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 523 (4th Cir. 1999) (holding that when a public figure seeks damages for a reputational injury "resulting from speech covered by the First Amendment, the plaintiff must satisfy the proof standard of New York Times").

Here, the Plaintiff, a candidate for public office, alleges that the Defendant engaged in extreme and outrageous conduct by publishing negative articles about her. [Doc. 3 at ¶¶ 51-52]. The Plaintiff, however, has alleged nothing that rises to the level of extreme and outrageous conduct that is required under the applicable law. The Plaintiff chose to run for public office, and a commentator who saw her as unfit wrote disparaging things about her. If the Plaintiff's claim of emotional distress could pass muster, every political campaign—from dog catcher to president—would generate litigation in perpetuity.

The Plaintiff's arguments regarding her emotional distress claim reflect a complete misunderstanding of this area of the law. For example, the

Plaintiff relies on North Carolina General Statute § 163-274(a)(9)[26] to argue that the Defendant's statements about her were "extreme and outrageous." [See Doc. 76 at 12]. Section 163-274(a)(9) prohibits the publication of "derogatory reports with reference to any candidate in any primary or election, *knowing such report to be false or in reckless disregard for its truth or falsity*, when such report is calculated or intended to affect the chances of such candidate for nomination or election." N.C. Gen. Stat. § 163-274(a)(9) (emphasis added). The Plaintiff, however, has failed to present evidence from which a reasonable juror could conclude that the Defendant published *any* statements about the Plaintiff with knowledge of falsity or with reckless disregard. Thus, the fact that § 163-274(a)(9) criminalizes certain defamatory conduct is irrelevant to her argument.[27]

---

[26] The Court notes that, in her briefing, the Plaintiff cites North Carolina General Statute § 163-274(8) for the proposition that "North Carolina has made it a crime to engage in the very conduct Defendant engaged in against Plaintiff: publication of false statements with reckless disregard of the truth about a candidate for public office during an election." [Doc. 76 at 12]. However, § 163-274(8) does not exist, and it is § 163-274(a)(9) that prohibits the publication of "derogatory reports with reference to any candidate in any primary or election, knowing such report to be false or in reckless disregard of its truth or falsity . . ." N.C. Gen. Stat. § 163-274(a)(9).

[27] Further, the Fourth Circuit has recently held that the constitutionality of § 163-274(a)(9) is *highly* questionable. Grimmett v. Freeman, 59 F.4th 689, 690 (4th Cir. 2023) (holding that "it is difficult to imagine [plaintiffs] losing" their claim that § 163-274(a)(9) violates the First Amendment). As the Plaintiff seeks to apply § 163-274(a)(9) here, it would undoubtably be unconstitutional.

The Plaintiff's reliance on <u>Woodruff v. Miller</u>, 64 N.C. App. 364, 307 S.E.2d 176 (1983), is also misplaced. While disparaging a private citizen with a thirty-year-old indictment may be outrageous, <u>see</u> <u>id.</u> at 365-67, 307 S.E.2d at 177-78, bringing to light very recent dirt regarding a candidate for public office is an entirely different matter. Democracy depends on the freedom of commentators to bring to the fore the negatives of a candidate – even if to examine them and find them untrue.

For all these reasons, the Court will grant summary judgment to the Defendant on the Plaintiff's intentional infliction of emotional distress claim.

## B.   Plaintiff's Motion for Summary Judgment

The Plaintiff moves for summary judgment with respect to her claims for libel per se, unfair and deceptive trade practices, and intentional infliction of emotional distress. [Doc. 72]. For the reasons articulated in the Court's analysis of the Defendant's Motion for Summary Judgment, the Plaintiff's Motion for Summary Judgment is denied.

## C.   Plaintiff's Motion to Take Judicial Notice

The Plaintiff moves the Court to take judicial notice of the following:

> 1.  There is no public record that Ms. Russe has ever filed for bankruptcy . . .
>
> 2.  There is no public record that Ms. Russe has ever been convicted of a non-traffic citation crime . . .

3. There is no public record that Ms. Russe has ever had a claim of taking someone's Trademark brought against her . . . .

[Doc. 57 at 1].

Federal Rule of Evidence 201(b)(2) provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."   Fed. R. Evid. 201(b)(2).   A court "must take judicial notice if a party requests it and the court is supplied with the necessary information."   Fed. R. Evid. 201(c)(2).   Here, the Plaintiff apparently expects the Court to conduct a nationwide search of bankruptcy records, criminal records, and trademark filings to determine whether she has filed for bankruptcy, been convicted of a non-traffic citation crime, or been subject to a claim of taking another's trademark.  This is not the type of information that is subject to being judicially noticed, and the Plaintiff has failed to comply with Rule 201(c)(2)'s requirement that *she* "suppl[y] [the Court] with the necessary information."[28]

---

[28] Instead, the Plaintiff has submitted her own affidavit, in which she states that she has never filed for bankruptcy, she has never been convicted of a non-traffic citation crime, and she has never been accused of stealing a trademark.  [Doc. 57-2].  The Plaintiff has also submitted a screenshot of PACER, indicating that the only search result found for a bankruptcy action involving "Rupa Vickers" is the bankruptcy action in which Mr. Decker is the debtor.  [Doc. 57-7 at 1-3].  However, the Plaintiff has not submitted any documentation stating that she has *never* been accused of stealing a trademark.  Rather, the Plaintiff submitted only the opposition filed by WeWork.  [Doc. 57-4].  Further, the

Further, the issue of whether no public records exist stating that the Plaintiff has filed for bankruptcy, been convicted of a non-traffic citation crime, or been accused of taking a trademark goes to whether the Defendant's statements about the Plaintiff regarding those topics are false. However, the Plaintiff has failed to present evidence from which a reasonable juror could conclude that the Defendant acted with actual malice when publishing statements related to bankruptcy, assault, larceny, and trademarks. Therefore, because the Plaintiff has failed to present sufficient evidence of a separate essential element of her defamation claims related to these statements, whether public records exist stating that the Plaintiff has filed for bankruptcy, been convicted of a non-traffic citation crime, or been accused of taking a trademark is irrelevant to the Court's analysis as to whether the Plaintiff's defamation claims survive summary judgment. Therefore, the Plaintiff's Motion to Take Judicial Notice is denied as moot.

## D. Defendant's Motion to Exclude Phaedra Xanthos from Testifying as Plaintiff's Expert

In support of her claims, the Plaintiff offers the expert opinion of Phaedra Xanthos, CPA, CFE to establish that the "Plaintiff suffered

---

Plaintiff submitted North Carolina criminal records for "Rupa Russe," "Rupa Vickers Russe," "Rupa R. Vickers," and "Rupa Vickers." [Doc. 57-5, Doc. 72-24 at 4-13]. These records do not show that the Plaintiff has *never* been convicted of a non-traffic citation crime. Rather, they provide information about the Plaintiff's criminal record only in North Carolina.

economic damages due to the Defendant's statements about her in the public." [Doc. 72-1 at 29; Doc. 72-27]. The Defendant moves to exclude Ms. Xanthos from testifying as an expert witness. [Doc. 67]. Having dismissed all of the Plaintiff's claims, the Court will deny as moot the Defendant's Motion to Exclude Phaedra Xanthos from Testifying as Plaintiff's Expert.

### E. Plaintiff's Motion to Seal

The Plaintiff moves for leave to file under seal certain materials submitted by the Plaintiff in support of her Motion for Summary Judgment. [Doc. 73]. Specifically, the Plaintiff moves for leave to file under seal eight pages of her personal medical records and two photos of a medication prescribed to the Plaintiff. [Doc. 69]. The Defendant has not filed any response in opposition to the Plaintiff's Motion to Seal.

The press and the public have, under both the First Amendment and the common law, a qualified right of access to judicial documents and records filed in civil and criminal proceedings. Doe v. Public Citizen, 749 F.3d 246, 265 (4th Cir. 2014). "The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that 'countervailing interests heavily outweigh the public interests in access.'" Id. at 265-66 (quoting in part Rushford v. New Yorker Mag., Inc., 846 F.2d 249, 253 (4th Cir. 1988)). The First Amendment

right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" Id. at 266 (quoting in part In re. Wash. Post Co., 807 F.2d 383, 390 (4th Cir. 1986)).

When presented with a motion to seal, the Court must: "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000).

In the present case, the public has been provided with adequate notice and an opportunity to object to the Plaintiff's Motion to Seal. The Plaintiff filed her Motion to Seal on January 20, 2023, and it has been accessible to the public through the Court's electronic filing system since that time. Further, the Plaintiff has demonstrated that the records filed under seal in Doc. 69 include the Plaintiff's personal medical records and reference the Plaintiff's health information. The Plaintiff asserts that she has suffered "extreme emotional distress." As such, her evidence of psychological injury would ordinarily not be subject to sealing. However, because the Plaintiff's claim for intentional infliction of emotional distress is dismissed for reasons

unrelated to this evidence, the Plaintiff's evidence of psychological injury is irrelevant to the dispositive question of whether her claim survives summary judgment. Therefore, the Court will grant the Plaintiff's Motion to Seal.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 65] is **GRANTED,** the Plaintiff's Motion for Summary Judgment [Doc. 72] is **DENIED,** and this action is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the Defendant's Motion for Judgment on the Pleadings [Doc. 42]**,** the Plaintiff's Motion in Limine to Take Judicial Notice [Doc. 57], and the Defendant's Motion to Exclude Phaedra Xanthos from Testifying as Plaintiff's Expert [Doc. 67] are **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the Plaintiff's Motion to Seal Plaintiff's Medical Records [Doc. 73] is **GRANTED,** and the records filed under seal as Document 69 shall remain under seal until further Order of this Court.

Signed: July 12, 2023

**IT IS SO ORDERED.**

Martin Reidinger
Chief United States District Judge